J-S90016-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: Y.J.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.S., MOTHER | |
| | No. 2270 EDA 2016 |

Appeal from the Order Dated June 16, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000713-2015

| | |
|---|---|
| IN THE INTEREST OF: T.L.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.S., MOTHER | |
| | No. 2272 EDA 2016 |

Appeal from the Order Dated June 16, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000714-2015

BEFORE: OTT, J., SOLANO, J., and JENKINS, J.

MEMORANDUM BY SOLANO, J.:          **FILED DECEMBER 23, 2016**

Appellant, T.S. ("Mother"), appeals from the orders involuntarily terminating her parental rights to Y.J.M., born October 2007, and T.L.M., born March 2011 (collectively, "the Children"). Upon careful review, we affirm.

On July 12, 2013, the Department of Human Services ("DHS") received a substantiated General Protective Service report alleging that Mother used and sold drugs and that the family home was known for drug activity. N.T., 6/16/16, at 13, 15-16. The report also alleged that Mother used inappropriate discipline on the children.

DHS visited the home and learned that Mother was diagnosed with several mental health disorders but did not receive any treatment. Ex. DHS-6 at 22; N.T., 6/16/16, at 13-17, 23. The family home was inappropriate, with mold and broken floors and doors. DHS also observed a hole in the ceiling from a leak originating from the bathroom located on the second floor and no banister on the second floor. One of the children had sustained a burn six months earlier when an unknown person tried to incinerate the front door of the home.

On August 29, 2013, Mother took Y.J.M. to the emergency room, where the child was diagnosed with scarlet fever. *See* Ex. DHS-6 at 23. The next day, DHS again visited Mother's home, when Mother disclosed that T.L.M. had killed Mother's cousin's cat. DHS also noticed a rash on T.L.M., and Mother explained that he was allergic to spider bites.

On September 25, 2013, Community Umbrella Agency ("CUA") began providing in-home services to the family. N.T., 6/16/16, at 14-15, 32. CUA imposed the following Single Case Plan objectives for Mother: (1) complete

drug and alcohol treatment; (2) complete mental health treatment; (3) obtain appropriate housing; and (4) maintain contact with the Children.

On December 17, 2013, DHS filed dependency petitions for the Children. *See* Exs. DHS-3 at 3-4.[1] On December 19, 2013, after a hearing, the Children were adjudicated dependent, and a shelter care application was filed.[2] The Children were allegedly residing with a relative of Mother, and the court ordered CUA to request an Order of Protective Custody ("OPC") when the Children were located. The Children were located later that same day, and DHS obtained an OPC for them and placed them in foster care.

A shelter care hearing for the Children was held on December 20, 2013. *See* Ex. DHS-3 at 9-10; N.T., 6/16/16, 27-28. At the conclusion of the hearing, the family court ordered that the Children be temporarily committed to the care and custody of DHS and granted Mother weekly supervised visits with the Children. The Children then were placed together in a pre-adoptive home that met their daily developmental, emotional, and medical needs and with foster parents who provided the Children with safety, stability, and support. *See* Exs. DHS-3 at 9, DHS-6 at 29.

_____

[1] Family Court of Philadelphia Juvenile Division Docket Nos. CP-51-DP-0002478-2013 (for Y.J.M.) and CP-51-DP-0002479-2013 (for T.L.M.).

[2] At the conclusion of the dependency hearing, a permanency hearing was scheduled for February 27, 2014; it was rescheduled for December 31, 2013. *See* Ex. DHS-3 at 4.

At an initial permanency review hearing on December 31, 2013, the Children's status remained unchanged. *See* Ex. DHS-3 at 9, DHS-6 at 29. One month later, on January 28, 2014, Mother tested positive for cannabis. *See id.* At a permanency review hearing on January 30, 2014, the family court granted Mother regular telephone contact with the Children before their scheduled bedtime and continued the weekly supervised visits. *See id.* On February 5, 2014, Mother began outpatient substance abuse treatment. *See id.*

By August 2014, Mother was escorting the Children to medical "well visits" and to dental appointments and interacting with the Children's school. *See* Ex. DHS-6 at 30. She was also maintaining weekly visitation. *See id.* at 31. On December 4, 2014, the family court ordered that Mother receive unsupervised community visits with the Children. *See* Exs. DHS-3 at 16, DHS-6 at 31. At a permanency review hearing on February 25, 2015, the court found that Mother had obtained appropriate housing and was receiving therapeutic services for substance abuse and mental health through the Community Organization for Mental Health and Retardation ("COMHAR"). *See* Exs. DHS-3 at 17; DHS-6 at 32. After the hearing, an order was entered that the Children would be reunified with Mother, if Mother passed a drug test, submitted a copy of her lease to CUA, and allowed CUA to conduct an assessment of her home. *See* Exs. DHS-3 at 16, DHS-6 at 32.

On March 6, 2015, CUA filed a report that it had assessed Mother's home and discovered that Mother needed "to make final home repairs to be made to bedroom ceiling including all previous repairs floor, walls, and railing." Ex. DHS-6 at 32.[3] On April 7, 2015, Mother failed to attend a scheduled drug and alcohol assessment appointment. *See id.* When a CUA case worker spoke with Mother in June 2015, Mother said that she did not feel safe, because she believed that she was being stalked and terrorized. N.T., 6/16/16, at 47. Mother asked to end the visits with the Children until she felt secure. *Id.* Mother did not give CUA a date to resume visits. *Id.* Between late June 2015 and October 2015, Mother had no contact with the Children. *Id.* at 47-48.

Mother was convicted of selling drugs and incarcerated from August 25, 2015, until March 11, 2016. N.T., 6/16/16, at 17, 57. *See also* Family Ct. Op., 8/18/16, "Discussion."[4] During this period of incarceration, she had no contact with the Children.

On October 2, 2015, DHS filed a petition for involuntary termination of parental rights as to the Children. Ex. DHS-6.

---

[3] The report itself is not in the certified record. This summary of CUA's assessment appears in the petition for involuntary termination of parental rights, Ex. DHS-6.

[4] The opinion is not paginated.

Since at least December 2015, Mother has not asked DHS about the Children's needs or their progress in school, and she has not inquired about resuming her attendance at their medical and dental appointments. N.T., 6/16/16, at 23-24. Furthermore, since at least December 2015, she has refused to agree to random drug screens. *Id.* at 16.

Mother did attend two visits with the Children in April 2016. N.T., 6/16/16, at 19. Two other visits scheduled for that month did not take place because Mother failed to confirm them 24 hours in advance, as required by CUA. *Id.* at 19-20. In May 2016, Mother confirmed one visit, but she did not attend it. *Id.* at 20. In June 2016, Mother attempted to confirm visits two weeks (rather than 24 hours) in advance, and the visits therefore did not go forward. *Id.* When Mother did visit, the Children referred to her as "Mommy" and asked when they could return home. *Id.* at 63. But they did not otherwise ask for Mother. *Id.* at 22-23, 48.

On June 16, 2016, the family court held a hearing on DHS' petition to terminate Mother's parental rights. During the hearing, it heard testimony from the CUA case manager, Melissa Urrutia, N.T., 6/16/16, at 11-45; the case supervisor, Melonie Handberry, *id.* at 46-50; and from Mother, *id.* at 52-70.

Ms. Urrutia was assigned to the Children's case in December 2015. N.T., 6/16/16, at 12. She testified that Mother is not any closer to reunification with the Children "now than she was two and a half years ago,"

despite regular meetings between CUA and Mother to discuss the Single Case Plan's objectives. *Id.* at 16, 24. Ms. Urrutia did not consider Mother's home to be appropriate for the Children, describing it as "unlivable." *Id.* at 13, 23. In Ms. Urrutia's opinion, the Children shared their parent-child bond with their current foster parents, calling them "Mommy" and "Poppy," and it is "in the Children's best interests to change the goal to adoption." *Id.* at 27-28.

Ms. Handberry, who had seen the Children in their foster home and at school, testified that termination of the Mother's rights would not irreparably harm the children. N.T., 6/16/16, at 49. She agreed with Ms. Urrutia that the Children's primary parent-child bond is with their pre-adoptive foster parents. *Id.*

Mother testified that she "loves [her] bab[ies]" and would "do anything for [them]." N.T., 6/16/16, at 63. In her opinion, her visits with the Children go well. *Id.* at 64. She also testified that she attended an eight-week parenting class in 2013 and provided her social worker with her certificate of completion. *Id.* at 54-55.

The family court found Ms. Urruita's and Ms. Handberry's testimony to be credible. Family Ct. Op., 8/18/16, "Discussion." The court did not state any credibility determinations about Mother's testimony on the record.

At the conclusion of the hearing, the family court terminated Mother's parental rights as to the Children and held that it was in the best interests of

the Children that their goal be changed to adoption. N.T., 6/16/16, at 81.

Mother filed timely appeals for Y.J.M. and T.L.M. separately, which this Court

consolidated *sua sponte*. On appeal, Mother presents two issues:

> A. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act 23 Pa. C.S.A. §2511 (a)(1), (a)(2), (a)(5), and (a)(8) as [M]other made progress towards working and meeting her [Single Case Plan] goals, namely staying drug free, working towards obtaining housing, working on parenting skills, and other goals, during the child's placement?
>
> B. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental physical and emotional needs of the child as required by the Adoption Act 23 Pa. C.S.A. §2511(b)?

Mother's Brief at 4.

We consider Mother's issues in light of our well-settled standard of

review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are satisfied. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

The family court found that there was sufficient evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1)-(2), (5), (8), (b). We will affirm if we agree with the trial court's decision as to any one subsection of 23 Pa.C.S. § 2511(a) and its decision as to Section 2511(b). *In re B.L.W.,* 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004); *see In re N.A.M.*, 33 A.3d 95, 100 (Pa.

Super. 2011). Here, we affirm the trial court's decision to terminate Mother's parental rights under subsections 2511(a)(1) and (b):

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. . . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

Mother contends:

[W]ith regard to 23 Pa.C.S. §2511 (a)(1), [she] has not for a period of at least six months preceding the filing of the petition evidenced a settled purpose of relinquishing her parental claim or failed to perform parental duties. . . . [S]he showed a continuing interest in [the Children] by her efforts of trying to be compliant with her objectives to reunify with her children namely obtaining housing, attending drug and alcohol treatment and mental health treatment.

Mother's Brief at 7. Contrary to Mother's argument, we conclude that the family court's findings of fact are supported by the record. The family court did not commit an error of law or abuse its discretion in holding that DHS, as

- 10 -

the party seeking termination, proved by clear and convincing evidence that Mother's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)(1). *See L.M.*, 923 A.2d at 511.

The petition for involuntary termination of parental rights as to both of the Children was filed on October 2, 2015. Thus, the period "six months immediately preceding the filing of the petition[s]" began on April 2, 2015.

Although Mother was compliant with her objectives for reunification between February 5, 2014, when she began outpatient substance abuse treatment, and February 25, 2015, when the court found that "reunification with Mother is imminent," her condition and her relationship with the Children deteriorated thereafter. Exs. DHS-3 at 16, DHS-6 at 29.

The court's February 25, 2015 order contemplating reunification between Mother and the children was subject to an assessment by CUA of Mother's home. However, as of March 6, 2015, CUA reported that Mother's home was in need of repairs to the bedroom ceiling, floor, walls, and railing, and a social worker would later describe the house as "unlivable." Ex. DHS-6 at 32; N.T., 6/16/16, at 23. There thus was evidence that at least from March 2015 forward, Mother failed to maintain a residence in a condition that would enable her to perform her parental duties.

Mother failed to attend a scheduled drug and alcohol assessment appointment on April 7, 2015. *See* Ex. DHS-6 at 32.[5] While this proceeding was pending, Mother was convicted of selling drugs, and from August 25, 2015, until March 11, 2016, she was incarcerated. N.T., 6/16/16, at 15, 17, 57. Since at least December 2015, she has refused to agree to random drug screens. *Id.* at 16.

Subsequent to her release from incarceration, Mother attended only two of the visits offered to her by CUA and did not once contact CUA about the Children's needs. N.T., 6/16/16, at 19-20. Meanwhile, as of the date of the petition, the Children had been in placement care for almost two years; their pre-adoptive home has been providing their essential parental care and meeting their everyday needs. *Id.* at 27-28.

Thus, the trial court appropriately found clear and convincing evidence that Mother's conduct satisfies the statutory grounds for termination. *See* 23 Pa.C.S. § 2511(a)(1); *L.M.*, 923 A.2d at 511. Since at least six months prior to the filing of the petition, Mother either refused or failed "to perform parental duties." Consequently, the first issue raised by Mother on appeal is without merit.

_____

[5] There is no indication in the record that Mother continued or resumed her drug and alcohol treatment subsequent to this missed appointment. *See* N.T., 6/16/16, at 15-16.

With respect to Section 2511(b), this Court has explained that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted), *appeal denied*, 897 A.2d 1183 (Pa. 2006). The trial court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

On appeal, Mother argues that the evidence does not support termination under Section 2511(b). She states:

> The trial Court erred in granting the DHS petition to involuntarily terminate the parental rights of [M]other because DHS failed to provide the Court with clear, competent, and convincing evidence that termination was in the best interest of the child, pursuant to 23 Pa.C.S.A. §2511(b). This means that the trial court must look at the parent-child relationship and examine how the effect of terminating that relationship will impact the child. . . . Mother's bond with her child demands that proper consideration be given by the trial court, and a bond or lack thereof was never proven by clear and convincing evidence. Mother testified to the extent of her bond with her children. She testified that she loves them and would do anything for them.

Mother's Brief at 6-7, 10. We are unpersuaded by Mother's argument.

- 13 -

"Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act." *In re K.K.R.-S*., 958 A.2d 529, 533 (Pa. Super. 2008) (citation omitted). Moreover,

> courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. . . . [T]ermination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

*T.S.M.*, 71 A.3d at 268-69.[6]

In this case, there is some evidence of an emotional bond between Mother and the Children. Mother did testify that she "loves [her] bab[ies]" and would "do anything for [them]." N.T., 6/16/16, at 63. She testified that during her infrequent visits with the Children, they called her "Mommy" and asked her when they would be permitted "to come home." *Id.*

Nevertheless, the existence of some bond between a child and a biological parent does not necessarily preclude termination of parental rights. *K.Z.S.*, 946 A.2d at 764. The question is whether an existing bond between the Children and Mother is "worth saving or whether it could be sacrificed without irreparable harm to [the Children]." *Id.*

---

[6] In *T.S.M.*, we explained that "termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home," but that "the Adoption Act specifically provides that a pending adoption is not a prerequisite to termination of parental rights involving agencies," as is the case here. *T.S.M.*, 71 A.3d at 268-69 (quoting 23 Pa.C.S. § 2512(b)).

Contrary to Mother's argument, there was clear and convincing evidence for the trial court reasonably to find that the existing parental bond is weak. *See K.Z.S.*, 946 A.2d at 762-63. The Children have resided in the same pre-adoptive foster home since December 2013 and share their primary parental bond with their foster parents. N.T., 6/16/16, at 27-28, 49. The Children refer to their foster parents as "Mommy" and "Poppy," and the foster parents meet all of the Children's developmental needs. *Id.* at 27-28. The Children did not ask for Mother when she was not with them. *Id.* at 22-23, 48. The record substantiated the family court's determination that the Children would not suffer irreparable harm if Mother's parental rights were terminated and that it was in the best interests of the Children to change their goal to adoption. *Id.* at 28, 49.

As such, we discern no abuse of discretion by the family court in concluding that the involuntary termination of Mother's parental rights will

serve the developmental, physical, and emotional needs and welfare of the Children pursuant to Section 2511(b). Accordingly, we affirm the family court's orders.

Orders affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 12/23/2016*